IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN (GREENBELT) DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | Civil Action No. |
|    31 Hopkins Plaza | ) | |
|    Baltimore, MD 21201 | ) ) | |
|          Plaintiff, | ) ) | COMPLAINT |
|        v. | ) ) | JURY TRIAL DEMAND |
| MECHANICAL DESIGN SYSTEMS, INC, | ) ) | |
|    6302 Aaron Lane, | ) | |
|    Clinton, MD 20735 | ) ) | |
|          Defendant. | ) ) | |

## NATURE OF THE ACTION

This is an action under the Equal Pay Act of 1963 to restrain the unlawful payment of wages to employees of one sex at rates less than the rates paid to employees of the opposite sex, and to collect back wages due to employees as a result of such unlawful payments and under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of sex and to provide appropriate relief to persons harmed by such practices. As alleged with greater particularity below, the United States Equal Employment Opportunity Commission alleges Defendant discriminated against LaTasha Wise and Shandi Johnson by paying them lower wages than those paid to one or more male counterparts for performing equal work, and that Defendant intentionally did so on the basis of sex.

## JURISDICTION AND VENUE

1.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343

and 1345. This action is authorized and instituted pursuant to Sections 16(c) and 17 of the Fair Labor Standards Act of 1938 (the "FLSA"), as amended, 29 U.S.C. §§ 216(c) and 217, to enforce the requirements of the Equal Pay Act of 1963, codified as Section 6(d) of the FLSA, 29 U.S.C. § 206(d), and pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were and are being committed within the jurisdiction of the United States District Court for the District of Maryland.

<u>PARTIES</u>

3.      Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of, *inter alia*, the Equal Pay Act and Title VII, and is expressly authorized to bring this action by Sections 16(c) and 17 of the FLSA, 29 U.S.C. §§ 216(c) and 217, as amended by Section 1 of Reorganization Plan No. 1 of 1978, 92 Stat. 3781, and Public Law 98-532 (1984), 98 Stat. 2705, and by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1), (3).

4.      At all relevant times, Defendant Mechanical Design Systems, Inc. (the "Defendant" or "MDS") has continuously been doing business in the State of Maryland, with its headquarters in Clinton, Maryland, in Prince George's County.

5.      At all relevant times, Defendant has continuously had at least 15 employees.

6.      At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

7.      At all relevant times, Defendant has acted directly or indirectly as an employer in relation to employees and has continuously been an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

8.      At all relevant times, Defendant has continuously been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(b), (i) and (j) of the FLSA, 29 U.S.C. §§ 203(b), (i) and (j).

## ADMINISTRATIVE PROCEDURES

9.      All conditions precedent to the institution of this lawsuit have been fulfilled.

10.     More than thirty days prior to the institution of this lawsuit, Ms. Wise filed a Charge of Discrimination with the EEOC alleging violations of Title VII and the Equal Pay Act by Defendant.

11.     Following the EEOC's investigative process, the agency issued a Letter of Determination dated May 23, 2022, notifying Defendant that EEOC had found it discriminated against Ms. Wise and Ms. Johnson with respect to wages based on sex in violation of Title VII and the Equal Pay Act.

12.     EEOC's Letter of Determination invited Defendant to join with EEOC in informal methods of conciliation to endeavor to resolve the discrimination found to have occurred.

13.     EEOC engaged in communications with Defendant concerning settlement but was unable to secure a conciliation agreement on terms acceptable to the Commission.

14.     EEOC issued to Defendant a Notice of Conciliation Failure dated August 30, 2022.

## STATEMENT OF CLAIMS

15.     Defendant is a heating, ventilation and air conditioning ("HVAC") subcontractor, providing HVAC design and installation services in the Washington, DC metropolitan area.

16.    Defendant operates from a physical location at 6302 Aaron Lane in Clinton, Maryland that includes offices and a warehouse.

17.    Defendant's operations are divided into units or departments, including: Sales and Estimating, which solicits, bids on and secures projects for MDS; Sheet Metal Shop and Warehouse, which maintains equipment and material, receives deliveries and fabricates sheet metal; Install, which installs ductwork and related sheet metal and sets HVAC units and equipment; Service, which installs or performs maintenance work on piping and HVAC controls and activates HVAC units and equipment; and Project Management, which coordinates and manages a project from award to completion.

18.    Defendant's Install Unit has a Manager and foremen/supervisors who are responsible for the technical issues and expertise related to install work on Defendant's projects and at its job sites.

19.    Defendant's Service Unit has a Manager and foremen/supervisors who are responsible for the technical issues and expertise related to service work on Defendant's projects and at its job sites.

20.    Defendant's Project Managers work similar schedules and primarily perform their duties from Defendant's offices, though on occasion will perform duties during on-site visits to the projects they are managing.

21.    Project Managers are subject to the same job expectations and performance requirements in the performance of their duties.

22.    Project Managers are responsible for overall administration and management of HVAC projects on which Defendant is a (sub)contractor, overseeing the project from award to completion. The core duties (hereinafter "Project Manager duties") include:

a.  Receiving and reviewing the notice of award, Defendant's bid and other related documents from Sales/Estimating;

b.  Creating and maintaining files for projects awarded to Defendant, including hard-copy and electronic files with project-specific documentation;

c.  Utilizing and maintaining computer programs with critical project activity, status and data, including "ComputerEase", a specialized software program designed for construction and building contractors and employed by MDS;

d.  Reviewing project bids and coordinating with Install and Service management to assess drawings and plans, anticipated scope of work, labor and material/equipment, schedule and other project information;

e.  Coordinating and securing necessary approvals, permits, inspections and insurances;

f.  Sourcing, processing submittals and Purchase Orders and managing equipment and material procurement as aligned with project timeline;

g.  Sourcing, reviewing and engaging/contracting subcontractors to assist MDS on projects;

h.  Coordinating with other MDS departments, including Install and Service management and crews, and other (sub)contractors and vendors on project status, timeline, equipment delivery, inspection and related project issues;

i.  Establishing, monitoring and revising as necessary project schedules, labor hours and budgets, and job costs and profitability;

j.  Coordinating with General Contractor, including for additional job-specific information or clarification, to assess or resolve issues with scope of work or drawings, and to discern need for and nature of change orders;

k.  Coordinating with Install and Service management and pricing and processing change orders;

l.  Creating and processing invoices, billings and similar documents;

m.  Client relations and project close-out with the customer.

23.  Defendant hired Shandi Johnson (nee Cobb; female) in or about 2008 in a reception position.

24.  In or about 2011 Defendant assigned Ms. Johnson to assist Project Manager Gerald Burch Jr. (male).

25.  At that time, Natalia MacMannis (female) and Gerald Burch Jr. (male) were Defendant's Project Managers.

26.  Ms. MacMannis was assigned to the Project Manager position in or about 2005 and resigned in or about 2015.

27.  As a Project Manager in 2005, Defendant paid Ms. MacMannis at an annual rate of approximately $60,000.

28.  In or about July 2015, at the time of her resignation from the Project Manager position, Defendant paid Ms. MacMannis at an annual rate of approximately $90,000.

29.  Shortly after Ms. MacMannis' resignation, MDS's President and co-owner James Shirley (male) and then co-owner Charles Clynes (male) met with Ms. Johnson and asked her to assume full Project Manager duties and manage her own projects alongside Burch.

30.     Mr. Burch was assigned to the Project Manager position in or about 2008 and remained in that position until his separation from Defendant in or about June 2017.

31.     At all times Mr. Burch was performing Project Manager duties, Defendant paid him at an annual rate of approximately $104,000.

32.     From in or about summer 2015 to in or about summer 2017, when Mr. Burch resigned, Ms. Johnson and Mr. Burch each performed Project Manager duties and were responsible for management of all Defendant's projects.

33.     In or about January 2017 Respondent hired Latasha Wise (female) at an annual rate of approximately $38,000.

34.     Initially, Ms. Wise assisted Ms. Johnson and Mr. Burch on projects each was respectively managing, but after several months Ms. Wise also began managing her own projects.

35.     Following Mr. Burch's resignation in or about June 2017, Ms. Johnson and Ms. Wise were the only employees in Project Management.

36.     At that time, Mr. Shirley advised Ms. Wise that she was expected to perform full Project Manager duties and told Ms. Wise and Ms. Johnson that Defendant was relying on them to manage all of Defendant's projects.

37.     Ms. Johnson and Ms. Wise divided up and assumed all Project Manager duties for the projects previously assigned to Mr. Burch, in addition to having independent responsibility for and performing Project Manager duties as to their own prior projects and newly awarded projects.

38.     In or about July 2017 MDS hired Paul Parker, Jr (male) as a Project Manager and paid Mr. Parker an annual wage rate of approximately $111,000.

39.     In 2017, MDS paid Ms. Johnson at an annual rate of approximately $55,000.

40.    Prior to Mr. Parker's start date, and while he was being acclimated to the position, Ms. Wise and Ms. Johnson continued to perform all Project Manager duties for all of Defendant's projects.

41.    During Mr. Parker's employment, he assumed some Project Manager duties for some projects, while Ms. Wise and Ms. Johnson had to perform other Project Manager duties on Mr. Parker's projects, while continuing to independently manage and perform all Project Manager duties as to their own respective projects.

42.    In or about December 2017 Mr. Parker resigned from MDS.

43.    After Mr. Parker's resignation, Ms. Wise and Ms. Johnson again were the only employees in the Project Management department at MDS and performed all Project Manager duties as to all of Defendant's projects.

44.    Ms. Johnson and Ms. Wise divided up and assumed Project Manager duties for all projects previously assigned to Mr. Parker that he did not close-out, in addition to having independent responsibility for and performing all Project Manager duties as to their own prior projects and newly awarded projects.

45.    In or about January 2018, MDS asked Ms. Wise and Ms. Johnson to document their duties and responsibilities as a Project Manager.

46.    At a subsequent departmental meeting with MDS management, Ms. Wise and Ms. Johnson explained the duties they performed as Project Managers and the fact that, between them, they managed all of Defendant's projects.  Ms. Wise and Ms. Johnson also asserted that they performed the same duties as, and should be paid the same as, the male Project Managers.  Mr. Shirley rejected this request.

47.    In or about March 2018, as part of her performance review, Ms. Johnson advised MDS management that, while she had not come from the field, she nevertheless performed all the duties of

the Project Manager position, she managed her own projects from start to finish, she was called upon to help other Project Managers who lacked her experience and proficiency, and, because of the turnover in the position, she routinely had to takeover projects from other Project Managers and complete them herself.  Ms. Johnson further complained that she was not properly being compensated as a Project Manager because she was a woman.  MDS took no corrective action in response to Ms. Johnson's complaint.

48.    In or about the summer of 2018, MDS assigned Douglas Patterson (male) to be a Project Manager.

49.    While Mr. Patterson had experience in sheet-metal installation in the field, this was not a Project Manager duty, and he lacked experience in, or familiarity with MDS's systems for, managing a project from start to finish or with most Project Manager duties - including those relating to billing, sourcing, procurement, permitting and inspections, scheduling, budgeting, closeouts, documentation and record-keeping.

50.    After transferring Mr. Patterson into the Project Manager position in 2018, Defendant paid him at an annual rate of approximately $98,000.  Defendant also provided Mr. Patterson with additional forms of wages, benefits and/or compensation that were never provided to Ms. Wise or Ms. Johnson, including a company vehicle and medical benefits and/or reimbursement for out-of-pocket medical expenses.

51.    In 2018 Defendant paid Ms. Wise at an annual rate of approximately $46,000 and Ms. Johnson at an annual rate of approximately $61,000.

52.    After Mr. Patterson's transfer into the Project Manager position, Ms. Wise and Ms. Johnson continued to perform all Project Manager duties and to independently manage their own

projects, while also trying to train and support Mr. Patterson in the many aspects of project management with which he was unfamiliar.

53.     After Mr. Patterson's assignment to the Project Manager position, projects were generally assigned to Mr. Patterson, Ms. Wise and Ms. Johnson on a rotational basis, with each responsible for managing their own respective projects.  Mr. Patterson, Ms. Wise and Ms. Johnson tried to maintain relative parity in workloads by dividing and assigning projects amongst them based on existing and new project load, size, and schedule.

54.     In or about the summer of 2018, Ms. Wise and Ms. Johnson discussed with Tracy Ziegler, MDS's Human Resources representative, their belief that MDS was paying Ms. Wise and Ms. Johnson less than it paid men to perform the same Project Manager duties.  MDS did not take corrective action to address the pay disparity raised by Ms. Wise and Ms. Johnson.

55.     In or about October 2018, Ms. Wise and Ms. Johnson complained to Mr. Shirley that their business cards listed their position title as "Assistant Project Manager", but that this designation did not accurately reflect that they performed all the duties of a Project Manager and independently managed most of Defendant's projects.

56.     Mr. Shirley, who often referred to Ms. Wise and Ms. Johnson as "the girls", dismissed their complaints and responded he didn't understand why it was so important to them since they were only business cards.

57.     Ms. Wise and Ms. Johnson requested a meeting with Mr. Shirley, Mr. Clynes, and MDS General Manager Charles Carter (male) concerning the alignment of the Project Management department.  At this meeting, Mr. Shirley confirmed there were no "Assistant" positions and that Ms. Johnson, Ms. Wise and Mr. Patterson were each a Project Manager who performed Project Manager duties.

58.     Shortly after this meeting, and in response to Ms. Wise's and Ms. Johnson's complaints, MDS created its first ever Project Manager job description.  The description incorporated three ostensible levels.

59.     When this new job description was presented to Ms. Wise and Ms. Johnson, they pressed MDS management about the actual duties they were performing and what "level" it considered each of the existing Project Managers to be and why.  Mr. Shirley and Mr. Carter declined to answer, offering only that it was still under review and such answers would be provided at a later meeting. MDS provided no further response and no meeting was held.

60.     While technical HVAC install and service expertise was not a requirement for or part of Project Manager duties, at MDS's request in or about October 2018 Ms. Wise and Ms. Johnson began HVAC training courses as part of the National Center for Construction Education and Research (NCCER) Standardized Craft Training Program, completing Introductory Craft Skills, Core Curriculum, and Construction Site Safety Orientation.  By May 2019, Ms. Johnson and Ms. Wise completed their NCCER certification for HVAC Level One.

61.     Mr. Shirley informed Ms. Wise and Ms. Johnson that they should not complete further HVAC training or the remaining years of the full HVAC journeyman program as the Project Manager position did not require that they be certified to perform or actually perform technical in-field HVAC installation and service work.

62.     Ms. Johnson and Ms. Wise had sought training and courses in Project Management, which MDS did not approve.  Subsequently, MDS provided Project Management training to Mr. Patterson.

63.     Following completion of the HVAC courses Ms. Wise and Ms. Johnson reminded MDS management that, at MDS's request they had enhanced their technical knowledge by completing

HVAC-1 courses, and they still performed all duties of the Project Manager position.  They sought to be paid in-line with what other Project Managers were paid.  MDS rejected this request.

64.    In 2019 MDS paid its Project Managers at the following approximate annual rates:

        a.   Mr. Patterson - $100,000

        b.   Ms. Wise - $51,000

        c.   Ms. Johnson - $65,000

65.    In 2020 MDS paid its Project Managers at the following approximate annual rates:

        a.   Mr. Patterson - $102,000

        b.   Ms. Wise – $55,000

        c.   Ms. Johnson - $71,000

66.    On April 23, 2020 Ms. Wise resigned from MDS, effective May 15, 2020.

67.    From May 15, 2020 through in or about September 2020 Ms. Wise continued to work part-time for MDS to assist in closing out her assigned projects.

68.    Following Ms. Wise's resignation, and continuing through present, Ms. Johnson and Mr. Patterson were and are the only remaining Project Managers (and the only employees in MDS's Project Management department) and are responsible for performing Project Manager duties as to all Defendant's projects.

69.    Continuing through Ms. Wise's resignation, Ms. Johnson and Mr. Patterson each perform Project Manager duties and are independently responsible for managing their own respective projects.  Ms. Johnson and Mr. Patterson try to maintain relative parity in workloads by dividing and assigning projects amongst them based generally on existing workload and new project size and schedule.

70.    In 2021 MDS paid its Project Managers at the following approximate annual wage rates:

     a.  Mr. Patterson - $102,000

     b.  Ms. Johnson - $71,000

71.    In 2022 MDS pays its Project Managers at the following approximate annual wage rates:

     a.  Mr. Patterson - $102,000

     b.  Ms. Johnson - $71,000

72.    At all times while performing Project Manager duties, Ms. Wise, Ms. Johnson, Mr. Patterson, Mr. Parker and Mr. Burch were each respectively managed, evaluated and supervised by Defendant's owners Mr. Shirly and Mr. Clynes and/or Defendant's General Manager Mr. Carter.

73.    Since being assigned Project Manager duties, Ms. Wise at all times successfully performed such duties and received favorable performance reviews from Defendant.

74.    Since being assigned Project Manager duties, Ms. Johnson at all times successfully performed such duties and received favorable performance reviews from Defendant.

<u>Count 1 – Title VII Claims</u>

75.    EEOC hereby repeats and incorporates by reference the allegations set forth in Paragraphs 15 through 74 of the Complaint.

76.    Since at least 2018, Defendant has engaged in unlawful employment practices in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by discriminating against Ms. Wise and Ms. Johnson with respect to their compensation because of their sex.

77.    The effect of the practices complained of above has been to deprive Ms. Wise and Ms. Johnson of equal employment opportunities and to otherwise adversely affect their status as employees because of their sex.

78.    The unlawful employment practices complained of above were and are intentional.

79.     The unlawful employment practices complained of above were and are done with malice or reckless indifference to the federally protected rights of Ms. Wise and Ms. Johnson.

<u>Count II – Equal Pay Act Claims</u>

80.     EEOC hereby repeats and incorporates by reference the allegations set forth in Paragraphs 15 through 74 of the Complaint.

81.     Since at least 2018, Defendant has violated Sections 6(d)(1) and 15(a)(2) of the FLSA, 29 U.S.C. §§ 206(d)(1) and 215(a)(2) by paying Ms. Wise and Ms. Johnson lower wages than those paid to their male colleague for performing equal work.

82.     As a result of the acts complained of above, Defendant unlawfully has withheld and is continuing to withhold the payment of wages due to Ms. Wise and Ms. Johnson.

83.     The unlawful practices complained of above were and are willful.

<u>PRAYER FOR RELIEF</u>

Wherefore, the Commission requests that this Court:

A.     Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with Defendant, from discriminating against females with respect to their compensation and from paying female employees lower compensation than their male comparators for performing equal work.

B.     Order Defendant to institute and carry out policies, practices and programs that provide equal compensation for women and eradicate the effects of its past and present unlawful employment practices.

C.     Order Defendant to make whole Ms. Wise and Ms. Johnson by providing appropriate backpay and lost benefits with prejudgment interest, in amounts to be determined at

trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

        D.      Grant a judgment requiring Defendant to pay appropriate back wages in amounts to be determined at trial, an equal sum as liquidated damages, and prejudgment interest to Ms. Wise and Ms. Johnson, whose wages were and are being unlawfully withheld as a result of the acts complained of above.

        E.      Order Defendant to make whole Ms. Wise and Ms. Johnson by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above in amounts to be determined at trial.

        F.      Order Defendant to make whole Ms. Wise and Ms. Johnson whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional and mental anguish, pain and suffering, stress and anxiety, loss of enjoyment of life, humiliation and frustration in amounts to be determined at trial.

        G.      Order Defendant to pay Ms. Wise and Ms. Johnson punitive damages for the malicious and/or reckless conduct described above, in amount to be determined at trial.

        H.      Grant such further relief as this Court deems necessary and proper in the public interest.

        I.      Award the Commission its costs of this action.

<u>JURY TRIAL DEMAND</u>

The Commission requests a jury trial on all questions of fact raised by its complaint.

Respectfully submitted,

GWENDOLYN YOUNG REAMS
Acting General Counsel

___ /s/ Debra Lawrence_____
DEBRA M. LAWRENCE
Regional Attorney
D. Md. Bar No. 04312

___ /s/ Maria Morocco_____
MARIA LUISA MOROCCO
Assistant Regional Attorney
Va. Bar No. 94043

THOMAS D. RETHAGE
Trial Attorney
D. Md. No. 96035
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Philadelphia District Office
801 Market St., Suite 1000
Philadelphia, PA 19107
thomas.rethage@eeoc.gov
Phone: 267-589-9756

16